**LAW OFFICES OF TODD M. FRIEDMAN, P.C**
Todd M. Friedman (SBN 216752)
324 S. Beverly Dr., #725
Beverly Hills, CA 90212
Phone: 877-206-4741
Fax: 866-633-0228
tfriedman@attorneysforconsumers.com

**GREENWALD DAVIDSON PLLC**
James L. Davidson (to seek admission *pro hac vice*)
5550 Glades Road, Suite 500
Boca Raton, FL 33431
Phone: 561-826-5477
Fax: 561-961-5684
jdavidson@mgjdlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Tracee Sweet, Lisa Jaramillo, James Ralston, and Tiffany Thomas, on Behalf of Themselves and Others Similarly Situated,<br><br>        Plaintiffs,<br><br>                    v.<br><br>LinkedIn Corporation,<br><br>        Defendant. | Case No.:<br><br>COMPLAINT FOR DAMAGES<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

Tracee Sweet, Lisa Jaramillo, James Ralston, and Tiffany Thomas (collectively, "Plaintiffs"), on behalf of themselves and others similarly situated, by and through undersigned counsel, allege the following against Defendant LinkedIn Corporation ("Defendant" or "LinkedIn"):

**Introduction**

1.    Defendant operates an online professional network called LinkedIn, through which the company's subscribers are able to create, manage and share their professional identities online, build and engage with their professional networks, and apply for jobs, and through which businesses can search for potential employees and post job listings, among other things. Defendant's stated goal is to be the professional profile of record for every professional worldwide.

2.    This lawsuit concerns Defendant's practice of violating the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.* through the use of its reference search functionality, which allows prospective employers, among others, for a subscription fee, to obtain reports containing "Trusted References" for job applicants who are members of LinkedIn.

3.    Though Defendant's dissemination of reference reports for a subscription fee brings its conduct within the purview of the FCRA, Defendant (1) fails to comply with the certification and disclosure requirements mandated by the FCRA for credit reporting agencies who furnish consumer reports for employment purposes, (2) fails to maintain reasonable procedures to limit the furnishing of consumer reports for the purposes enumerated in the FCRA and to assure maximum possible accuracy of consumer report information, and (3) fails to provide to users of the reference reports the notices mandated by the FCRA.

4.    Plaintiffs are consumers harmed by Defendant's violations of the FCRA. Through this lawsuit, they seek damages for Defendant's past violations, and injunctive relief requiring Defendant to comply with the FCRA.

**Jurisdiction and Venue**

5.    This Court has jurisdiction pursuant to 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

6.      Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b), where Defendant resides in this State and this District.

**Parties**

7.      Tracee Sweet ("Plaintiff Sweet") is a natural person residing in Gwinnett County, Georgia.

8.      Lisa Jaramillo ("Plaintiff Jaramillo") is a natural person residing in Indian River County, Florida.

9.      James Ralston ("Plaintiff Ralston") is a natural person residing in San Bernardino County, California.

10.     Tiffany Thomas ("Plaintiff Thomas") is a natural person residing in Palm Beach County, Florida.

11.     Defendant is a Delaware corporation with its principal place of business located at 2029 Stierlin Ct., Mountain View, CA 94043.  Defendant can be served through its registered agent, Lawyers Incorporating Service, 2710 Gateway Oaks Dr., Ste. 150N, Sacramento, CA 95833.

**The FCRA and the Use and Dissemination of Consumer Reports**

12.     The FCRA was enacted in 1970 out of concern for the growing use and potential misuse of consumer credit history.

13.     To that end, the FCRA regulates the practices of consumer reporting agencies that collect and compile consumer information into consumer reports for use by credit grantors, insurance companies, potential employers, landlords, and other entities in making eligibility decisions affecting consumers, and requires that credit reporting agencies follow "reasonable procedures" to protect the confidentiality, accuracy, and relevance of credit and other consumer

information.[1]

14.    To do so, the FCRA establishes a framework for the use and dissemination of personal information.  This framework includes rights of data quality, data security, use limitations, requirements for data destruction, notice, user participation, and accountability.

15.    In order to further Congress's goal of promoting the accuracy, fairness and privacy of personal information, the FCRA has specific provisions regarding the dissemination by a consumer reporting agency of information bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living.

16.    Such information, when that information is used or expected to be used, or was collected in whole or in part, for the purpose of serving as a factor in establishing the consumer's eligibility for credit or insurance, employment purposes, or for any other purpose authorized under 15 U.S.C. § 1681b, is known as a "consumer report."

17.    The FCRA protects consumer data and privacy in two ways. First, the FCRA limits the sale and access of consumer report data to a handful of "permissible" purposes, such as credit, insurance and job applications, licenses, or review of an account.  Second, the FCRA makes credit reporting agencies who sell consumer report data accountable to the consumer.

18.    These FCRA requirements function to make the activities of credit reporting agencies and their use of consumer information fair, open, and

---

[1]    The FCRA broadly defines a credit reporting agency as any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.  *See* 15 U.S.C. § 1681a(f).

challengeable, and accountable for the misuse of consumer report information.

## Background on LinkedIn

19.     LinkedIn holds itself out as the world's largest web-based professional network, and the most extensive, accurate and accessible network focused on professionals, with over 300 million members worldwide.

20.     Anyone can sign up for LinkedIn for free by creating a LinkedIn login and password at the website www.linkedin.com. Once logged onto the site, a member can create her/his own professional profile, complete with a listing of professional experience and educational background, among other things.

21.     When a registered LinkedIn user adds her/his professional experience and educational background to her/his profile page, the personal information gets added to the ever-expanding LinkedIn professional database.

22.     After creating a profile, the next step a member takes is to create "connections."  LinkedIn connections are typically colleagues, business contacts, friends or classmates, and need to be invited to join a member's network.  In fact, LinkedIn recommends that all connections be viewed as potential professional or personal references.

23.     To turn a contact into a connection, the member needs to invite that person to join her/his network and the invitee needs to accept. Once two members are connected, their profile information is shared and, subject to privacy settings, each member has access to the other member's list of connections for further networking.

24.     Connections across the network are classified in three degrees: first degree connections are members who agree to connect, second degree connections are members who share one or more mutual connections, and third degree connections are related via two connections. As a result, one online publication has called LinkedIn the "professional person's answer to 'Six Degrees

of Separation.'"

25.     Through this process, LinkedIn assembles, aggregates, and publishes information from hundreds of millions of consumers related to their past and present employers, past and present employment duties, employment dates, employment skills, co-workers, contacts, educational background, honors and awards, among other things.

26.     Though LinkedIn aggregates a significant amount of consumer information, LinkedIn represents to its members that it does not license or sell member content to third-parties to show to anyone else without the express permission of the particular member.

27.     LinkedIn has multiple utilities for job seekers, recruiters and potential employers.

28.     LinkedIn allows businesses to post employment opportunities, and search for active and passive job candidates, and for LinkedIn members to search for, and apply for those employment opportunities.  LinkedIn pitches itself to businesses as the "ultimate talent pool to source the best candidates for your hiring needs."

29.     Conversely, LinkedIn pitches itself to consumers as "the one stop shop for your professional life," allowing consumers to "connect to people, see job postings, get discovered for what you do best and more."

30.     In LinkedIn's most recent quarterly report, it noted that there were now one million jobs posted on LinkedIn.

31.     LinkedIn also offers "proprietary search technology" that allows users to conduct real-time, multilingual searches of user data, including people, job postings, groups and network updates, among other things.

**LinkedIn's Reference Search Functionality**

32.     Part of LinkedIn's search technology is its reference search

functionality.      This reference search functionality is a subscription-based feature that allows users, including potential employers, to search for "references" on any LinkedIn member.

33.     According to a webpage in the "Premium Help Center" on LinkedIn's website, "[a] reference search locates people in your network *who can provide reliable feedback about a job candidate* or business prospect. You'll see a list of people who have worked at the same company during the same time period as the member you'd like to learn more about." (emphasis added).

34.     A separate webpage in the "Premium Help Center" on Defendant's website explains to potential employers how to find "*Trusted References for Job Candidates*" (emphasis added) by going to a member's profile and then clicking the "Search for References" link.

35.     Once a user selects the Search for References link, LinkedIn generates a report containing the names, locations, employment areas, current employers, and current positions of all persons in the user's network who may have worked with the applicant ("Reference Report").

36.     The Reference Report also contains, for each purported reference, the name of the employer in common between the reference and the job applicant, and the reference's position and years employed at that common employer.  A copy of a sample Reference Report is attached hereto as Exhibit "A."

37.     In addition, the Reference Report encourages the potential employer to contact the references through an "Introduction," which, according to LinkedIn, lets the potential employer "contact users in your network, through the people you know."

38.     Further, the Reference Report allows the potential employer to view the profile of any of the "references" in the Report, to "connect" with them on LinkedIn, and to send them a message by "InMail," LinkedIn's internal

messaging system.

39.     The reference search functionality on LinkedIn is only available to premium members.  In other words, the only users who can obtain a Reference Report are users who pay LinkedIn a monthly or yearly fee, or have some other type of paid arrangement with LinkedIn.  Indeed, the LinkedIn subscription page advises users that one of the services they gain access to when they upgrade from a free to a paid membership is "Reference Search," which allows paying members to "[g]et a list of people in your network who can provide a reference for someone you are interested in."

40.     LinkedIn members are not notified by LinkedIn (or anyone else) when potential employers run a Reference Report on them.  Indeed the only parties that have information concerning the running of a Reference Report on a LinkedIn member are LinkedIn and individual or entity that pulls the Reference Report.

41.     As such, any potential employer can anonymously dig into the employment history of any LinkedIn member, and make hiring and firing decisions based upon the information they gather, without the knowledge of the member, and without any safeguards in place as to the accuracy of the information that the potential employer has obtained.

42.     Such secrecy in dealing in consumer information directly contradicts the express purposes of the FCRA, which was enacted to promote accuracy, fairness, and the privacy of personal information assembled by credit reporting agencies.

43.     Compounding this lack of transparency, LinkedIn's marketing and advertising promote the use of its reference search functionality to potential employers as a means to decide whether to interview a job candidate, or whether to hire a job candidate after an interview.

44.    Indeed, LinkedIn's marketing includes statements that its Reference Search functionality allows potential employers to "*[g]et the real story on any candidate*" (emphasis added) and "*[f]ind references who can give real, honest feedback*." (emphasis added).  Defendant advises potential employers that they can "[r]each out directly to past employers and collegues [sp] with InMail Messages."

45.    And LinkedIn has specifically targeted companies operating in the human resources and job recruiting industries through products such as LinkedIn Recruiter, which allows enterprises and professional organizations "to find, contact and hire highly qualified passive and active candidates," Talent Basic, Talent Finder and Talent Pro, which "enables recruiters and hiring managers to find, contact and manage potential candidates, leveraging Premium Search Filters, InMail, Profile Organizer and other premium features," and Self-Service Posting, which allows "recruiters and hiring managers to post and manage job opportunities" on LinkedIn's network.

46.    In essence, LinkedIn has created a marketplace in consumer employment information, where it sells employment information, that may or may not be accurate, and that it has obtained in part from unwitting members, and without complying with the FCRA.  In turn, potential employers, among others, obtain that information from LinkedIn, and may make hiring and firing decisions utilizing said information, among other things, without providing notice to the persons whose information they have obtained, and without themselves complying with the FCRA.  And all of this goes on without the knowledge of the member whose information is being disseminated.

## LinkedIn Violated the Rights of Plaintiffs and Other Consumers Through its Reference Search Functionality

47.    Plaintiffs are each individuals who, upon information and belief, had

their rights under the FCRA violated by virtue of Defendant's reference search functionality.

48.     At all relevant times, each of the Plaintiffs was a registered user on LinkedIn.

49.     Upon information and belief, each of the Plaintiffs had a Reference Report run on them via LinkedIn.

50.     Upon information and belief, LinkedIn furnished a Reference Report on each of the Plaintiffs for employment purposes.

51.     However, because LinkedIn does not disclose to its members when Reference Reports are run, all of the evidence as to the date and timing of the Reference Reports, and the name of the entities to whom they were furnished, is solely in the hands of LinkedIn and any third parties that accessed the Reference Reports.

52.     In July 2014, Plaintiff Sweet located a job opening for employment in the hospitality industry on LinkedIn, and submitted her resume through LinkedIn.

53.     Several days later, she received a notification from LinkedIn that the general manager of the potential employer had viewed her profile.

54.     Shortly thereafter, the general manager contacted Plaintiff Sweet through email, wrote that he had heard good things about her, and that his company wanted to interview her immediately.

55.     Later that week, the general manager interviewed Plaintiff Sweet. At the end of the interview, Plaintiff Sweet told the general manager to let Plaintiff Sweet know if he wanted her to provide a list of references.  The general manager did not ultimately obtain a list of references directly from Plaintiff Sweet.

56.     Following the interview, Plaintiff Sweet was contacted by the potential employer and advised that she was going to be hired for the position.

57.     However, soon thereafter, the company called her back and said it had changed its mind and that she would not be hired.

58.     When Ms. Sweet inquired as to why she was first offered the job and then told she was not going to be hired, the general manager told her that the company had checked some references for Plaintiff Sweet and, based on those references, had changed its mind.

59.     In August 2014, a third-party recruiter connected with Plaintiff Ralston on LinkedIn and then communicated with him with regard to some potential job opportunities.

60.     Plaintiff Ralston subsequently interviewed with the recruiter over the phone, and the recruiter told Plaintiff Ralston that she would be submitting his resume to two of the employers.

61.     Thereafter, she advised Plaintiff Ralston to visit the website of one of the employers and to complete its online application, and told him that she expected that the potential employer would be interviewing him.

62.     Plaintiff Ralston did so, but was later advised that both of the potential employers declined to interview him.

63.     In July 2014, Plaintiff Jaramillo was contacted by an in-house recruiter for a company in the hospitality industry.

64.     Plaintiff Jaramillo and the in-house recruiter discussed a job opening that the company had, including salary requirements, and Plaintiff Jaramillo expressed her interest in the position.

65.     Shortly thereafter, another in-house recruiter from the same company connected with Plaintiff Jaramillo on LinkedIn.

66.     The company did not ultimately remain interested in Plaintiff Jaramillo thereafter.

67.     In July 2014, Plaintiff Thomas applied for a job in the transportation

industry through a LinkedIn job posting.

68.   Shortly thereafter, she received a notification that a purchasing manager from the potential employer had viewed her LinkedIn profile. The purchasing manager was the direct supervisor for the job for which she had applied.

69.   Plaintiff Thomas subsequently interviewed for the position with the individual from the company who had viewed her LinkedIn profile, but has not received word back as to whether the company will offer her employment.

## Class Action Allegations

70.   Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of one Class and one Subclass consisting of:

### The Class

> All persons in the United States who, in the two years prior to the filing of this Complaint, had a Reference Report run on them that was initiated through LinkedIn's "search for references" functionality.

### The Subclass

> All persons in the United States who, in the two years prior to the filing of this Complaint, applied for employment through a LinkedIn job posting and had a Reference Report run on them by the potential employer and/or one of its employees or agents, which was initiated through LinkedIn's "search for references" functionality.

Excluded from the Class and Subclass is Defendant, the officers, members, and directors of Defendant, members of their immediate families and their legal

representatives, heirs, successors, or assigns, and any entity in which Defendant has or had a controlling interest.

71.   The proposed Class and Subclass are believed to be so numerous that joinder of all members is impracticable.  The exact number of members of the Class and Subclass is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery.  The proposed Class and Subclass is believed to be ascertainable in that the names and addresses of all members of the Class and Subclass can be identified in business records maintained by Defendant.

72.   Plaintiffs' claims are typical of the claims of the members of the Class and Subclass because Plaintiffs and all Class and Subclass members' claims originate from the same conduct, practice and procedure on the part of Defendant and Plaintiffs possess the same interests and has suffered the same injuries as each member of each of the Class and Subclass.

73.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and Subclass and have retained counsel experienced and competent in class action litigation.  Plaintiffs have no interests that are contrary to or in conflict with the members of the Class and Subclass that Plaintiffs seek to represent.

74.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class and Subclass may be relatively small, the expense and burden of individual litigation may make it impracticable for the members of the Class and Subclass to individually redress the wrongs done to them.  There should be no difficulty in the management of this action as a class action.

75.     Issues of law and fact common to the members of the Class and Subclass predominate over any questions that may affect only individual members, in that Defendant has acted on grounds generally applicable to the entire Class and Subclass.   Among the issues of law and fact common to the Class and Subclass are:

     a.   Defendant's violations of the FCRA as alleged herein;

     b.   the availability of statutory penalties; and

     c.   the availability of attorneys' fees and costs.

76.     Upon information and belief, absent a class action, Defendant's violations of the law will be allowed to proceed without a full, fair, judicially supervised remedy.

## Count I: Violation of the FCRA at 15 U.S.C. § 1681b(b)

77.     Plaintiffs repeat and reallege each allegation contained in paragraphs 1 - 76.

78.     LinkedIn's Reference Reports are consumer reports as defined in 15 U.S.C. § 1681a(d) because they bear on a consumer's character, general reputation, mode of living, or personal characteristics, and/or other factors listed in 15 U.S.C. § 1681a(d), and are used or expected to be used, in whole or in part, as a factor in determining the consumer's eligibility for employment purposes.

79.     By providing consumer reports, LinkedIn is, and at all relevant times was, a consumer reporting agency as that term is defined in 15 U.S.C. § 1681a(f). Indeed, LinkedIn regularly assembles information on consumers into Reference Reports that it provides to third parties in interstate commerce, including companies in the human resources and recruiting industries, for monetary fees or dues.  LinkedIn is in the business of furnishing consumer reports to third parties that are used or expected to be used for employment purposes.

80.     The FCRA at 15 U.S.C. §1681b(b) provides that a consumer

reporting agency may only furnish a consumer report for employment purposes if (a) the person who obtains such report from the agency certifies to the agency that—(i) the person has complied with 15 U.S.C. §1681b(b)(2) with respect to the consumer report, and the person will comply with 15 U.S.C. §1681b(b)(3) with respect to the consumer report if that section becomes applicable, and (ii) information from the consumer report will not be used in violation of any applicable Federal or State equal employment opportunity law or regulation; and (b) the consumer reporting agency provides with the report, or has previously provided, a summary of the consumer's rights under 15 U.S.C. §1681b(b).

81.    Upon information and belief, LinkedIn regularly furnishes consumer reports for employment purposes without obtaining the certifications required by 15 U.S.C. §1681b(b) and without providing, with the report, a summary of the consumer's rights under 15 U.S.C. §1681b(b).

82.    As such, LinkedIn has violated 15 U.S.C. § 1681b(b).

83.    Defendant's violations of the FCRA are willful in that it intentionally and knowingly disseminated the Reference Reports, and did so (and continues to do so) in a manner that violated the FCRA.

## Count II: Violation of the FCRA at 15 U.S.C. § 1681e(a)

84.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1 - 76.

85.    LinkedIn's Reference Reports are consumer reports as defined in 15 U.S.C. § 1681a(d) because they bear on a consumer's character, general reputation, mode of living, or personal characteristics, and/or other factors listed in 15 U.S.C. § 1681a(d), and are used or expected to be used, in whole or in part, as a factor in determining the consumer's eligibility for employment purposes.

86.    By providing consumer reports, LinkedIn is, and at all relevant times

was, a consumer reporting agency as that term is defined in 15 U.S.C. § 1681a(f). Indeed, LinkedIn regularly assembles information on consumers into Reference Reports that it provides to third parties in interstate commerce, including companies in the human resources and recruiting industries, for monetary fees or dues. LinkedIn is in the business of furnishing consumer reports to third parties that are used or expected to be used for employment purposes.

87. The FCRA at 15 U.S.C. § 1681e(a) requires consumer reporting agencies to maintain reasonable procedures to limit the furnishing of consumer reports to the purposes specified in 15 U.S.C. § 1681b. These procedures require that a consumer reporting agency, prior to furnishing a user with a consumer report, require the prospective user of the information to identify itself to the consumer reporting agency, verify the purpose for which the information is sought, and certify that the information will be used for no other purpose.

88. The consumer reporting agency must make a reasonable effort to verify the identity of each new prospective user and the uses certified prior to furnishing such user a consumer report. In addition, the FCRA prohibits any consumer reporting agency from furnishing a consumer report to any person it has reasonable grounds to believe will not use the consumer report for a permissible purpose.

89. Upon information and belief, LinkedIn has failed to maintain any procedures required by section 15 U.S.C. § 1681e(a).

90. Indeed, anyone with a premium subscription on LinkedIn can anonymously pull a Reference Report on a LinkedIn member without taking any action other than clicking "search for references" on the member's profile.

91. As such, LinkedIn has violated 15 U.S.C. § 1681e(a).

92. Defendant's violations of the FCRA are willful in that it intentionally and knowingly disseminated the Reference Reports, and did so (and

continues to do so) in a manner that violated the FCRA.

## **Count III: Violation of the FCRA at 15 U.S.C. § 1681e(b)**

93.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1 - 76.

94.    LinkedIn's Reference Reports are consumer reports as defined in 15 U.S.C. § 1681a(d) because they bear on a consumer's character, general reputation, mode of living, or personal characteristics, and/or other factors listed in 15 U.S.C. § 1681a(d), and are used or expected to be used, in whole or in part, as a factor in determining the consumer's eligibility for employment purposes.

95.    By providing consumer reports, LinkedIn is, and at all relevant times was, a consumer reporting agency as that term is defined in 15 U.S.C. § 1681a(f). Indeed, LinkedIn regularly assembles information on consumers into Reference Reports that it provides to third parties in interstate commerce, including companies in the human resources and recruiting industries, for monetary fees or dues.  LinkedIn is in the business of furnishing consumer reports to third parties that are used or expected to be used for employment purposes.

96.    The FCRA at 15 U.S.C. § 1681e(b) requires all  consumer reporting agencies to follow reasonable procedures to assure maximum possible accuracy of consumer report information.

97.    Upon information and belief, LinkedIn has failed to follow any reasonable procedures to assure maximum possible accuracy of the information in the Reference Reports that it prepared, as required by 15 U.S.C. § 1681e(b).

98.    For instance, while LinkedIn's Reference Reports provide the names, and past and current employment positions, of persons who purportedly worked with the LinkedIn member whose report was run, LinkedIn relies solely on each

of its members to accurately input and update their own employment history, including job titles, on LinkedIn.  Thus, if a LinkedIn member has misrepresented her/his job title from a past employer, or fabricated an employment position entirely, that misrepresentation would appear on a Reference Report for an individual who purportedly worked at the same employer with that member. Such inaccurate information could lead to negative consequences for any job applicant whose potential employer contacts that "reference."

99.     As such, LinkedIn has violated 15 U.S.C. § 1681e(b).

100.    Defendant's violations of the FCRA are willful in that it intentionally and knowingly disseminated the Reference Reports, and did so (and continues to do so) in a manner that violated the FCRA.

## Count IV: Violation of the FCRA at 15 U.S.C. § 1681e(d)

101.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1 - 76.

102.    LinkedIn's Reference Reports are consumer reports as defined in 15 U.S.C. § 1681a(d) because they bear on a consumer's character, general reputation, mode of living, or personal characteristics, and/or other factors listed in 15 U.S.C. § 1681a(d), and are used or expected to be used, in whole or in part, as a factor in determining the consumer's eligibility for employment purposes.

103.    By providing consumer reports, LinkedIn is, and at all relevant times was, a consumer reporting agency as that term is defined in 15 U.S.C. § 1681a(f).  Indeed, LinkedIn regularly assembles information on consumers into Reference Reports that it provides to third parties in interstate commerce, including companies in the human resources and recruiting industries, for monetary fees or dues.  LinkedIn is in the business of furnishing consumer reports to third parties that are used or expected to be used for employment purposes.

104.   The FCRA at 15 U.S.C. § 1681e(d) requires consumer reporting agencies to provide a "Notice to Users of Consumer Reports: Obligations of Users Under the FCRA" ("User Notice") to any person to whom a consumer report is provided by the consumer reporting agency.

105.   The User Notice provides users of consumer reports with important information regarding their obligations under the FCRA, including the obligation of the user to provide a notice to consumers who are the subject of an adverse action (*e.g.*, denial of employment) based in whole or in part on information contained in the consumer report.

106.   Upon information and belief, LinkedIn has failed to provide the User Notice required by 15 U.S.C. § 1681e(d) to those who purchase its Reference Reports.

107.   As such, LinkedIn has violated 15 U.S.C. § 1681e(d).

108.   Defendant's violations of the FCRA are willful in that it intentionally and knowingly disseminated the Reference Reports, and did so (and continues to do so) in a manner that violated the FCRA.

## Count V: Violation of the FCRA at 15 U.S.C. § 1681b

109.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1 - 76.

110.   LinkedIn's Reference Reports are consumer reports as defined in 15 U.S.C. § 1681a(d) because they bear on a consumer's character, general reputation, mode of living, or personal characteristics, and/or other factors listed in 15 U.S.C. § 1681a(d), and are used or expected to be used, in whole or in part, as a factor in determining the consumer's eligibility for employment purposes.

111.   By providing consumer reports, LinkedIn is, and at all relevant times was, a consumer reporting agency as that term is defined in 15 U.S.C. § 1681a(f). Indeed, LinkedIn regularly assembles information on consumers into Reference

Reports that it provides to third parties in interstate commerce, including companies in the human resources and recruiting industries, for monetary fees or dues.  LinkedIn is in the business of furnishing consumer reports to third parties that are used or expected to be used for employment purposes.

112.  The FCRA at 15 U.S.C. § 1681b prohibits consumer reporting agencies from furnishing consumer reports to persons who the reporting agency does not have reason to believe have a "permissible purpose."

113.  While employment purposes is included as a permissible purpose pursuant to 15 U.S.C. § 1681b(b), that section mandates certain conditions for furnishing and using consumer reports for employment purposes. [2]

114.  Upon information and belief, LinkedIn regularly furnishes consumer reports to third parties without procedures to inquire into the purpose for which the user is acquiring the report.

115.  As such, LinkedIn has violated 15 U.S.C. § 1681b in furnishing consumer reports to persons that it did not have a reason to believe had a permissible purpose to obtain a consumer report.

116.  Defendant's violations of the FCRA are willful in that it intentionally and knowingly disseminated the Reference Reports, and did so (and continues to do so) in a manner that violated the FCRA.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a)  Determining that this action is a proper class action and designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

---

[2]   The FCRA defines "employment purposes" when used in connection with a consumer report to mean a report used for the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee.  *See* 15 U.S.C. § 1681a(h).

b)      Adjudging and declaring that Defendant willfully violated, or in the alternative, negligently violated, 15 U.S.C. § 1681e(a), 15 U.S.C. § 1681e(b), 15 U.S.C. § 1681e(d), 15 U.S.C. § 1681b, and 15 U.S.C. § 1681b(b), and enjoining Defendant from further violations of 15 U.S.C. § 1681e(a), 15 U.S.C. § 1681e(b), 15 U.S.C. § 1681e(d), 15 U.S.C. § 1681b, and 15 U.S.C. § 1681b(b) with respect to Plaintiffs and the other members of the Class and Subclass;

c)      Awarding Plaintiffs and members of the Class and Subclass statutory damages pursuant to 15 U.S.C. § 1681n(a)(1)(A), and actual damages pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

d)      Awarding Plaintiffs and the members of the Class and Subclass punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

e)      Awarding Plaintiff and members of the Class their reasonable costs and attorneys' fees incurred in this action, including expert fees, pursuant to Rule 23 of the Federal Rules of Civil Procedure, and 15 U.S.C. § 1681n(a)(3) or 15 U.S.C. § 1681o(a)(2).; and

f)      Awarding other and further relief as the Court may deem just and proper.

### TRIAL BY JURY

Plaintiffs are entitled to and hereby demand a trial by jury.

Respectfully submitted this 9th day of October, 2014.

LAW OFFICES OF TODD M. FRIEDMAN, P.C.

By:      /s/ Todd M. Friedman

      Todd M. Friedman
      Law Offices of Todd M. Friedman
      Attorney for Plaintiff

# EXHIBIT "A"

Search for people, jobs, companies, and more...    🔍   Advanced



Home    Profile    Connections    Jobs    Interests              Business Services     Upgrade

Find People    Advanced People Search    **Reference Search**    Saved Searches        Profile Organizer

## Reference Search Results
Go back to Profile

---

**We found 12 users in your network who may have worked with** ▓▓▓▓▓▓ **at these positions:**

☑ Sr. Contract Specialist at ▓▓▓▓ from 2012-2014
☑ Purchasing Agent at ▓▓▓▓▓▓ from 2010-2012
☑ Buyer at ▓▓▓▓▓▓ from 2010-2011

[ Search ]

---

**Your Network**                                          What do these icons mean?

▓▓▓▓▓▓▓
Miami/Fort Lauderdale Area    Nonprofit Organization Management            2nd
Current: Vice President of Education at ▓▓▓▓▓▓▓▓ ; City Councilman at ▓▓▓▓▓▓    👍     ⚙
▷ **City Councilman at** ▓▓▓▓▓▓▓▓ **from 1999-Present**          3    500+

▓▓▓▓▓▓▓
Miami/Fort Lauderdale Area    Government Administration          2nd
Current: Budget Director/CRA Coordinator at ▓▓▓▓▓▓       👍    ⚙
▷ **Budget Director/CRA Coordinator at** ▓▓▓▓▓▓ **from 2012-Present**   1    166
▷ **Budget Administrator at** ▓▓▓▓▓▓ **from 2010-2012**

▓▓▓▓▓▓▓
West Palm Beach, Florida Area    Information Technology and Services    2nd
Current: President at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓        👍    ⚙
▷ **President at** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ **from 2011-Present**    1    500+

▓▓▓▓▓▓▓
Miami/Fort Lauderdale Area    Law Practice           2nd
Current: Deputy City Attorney at ▓▓▓▓▓▓▓▓         ⚙
▷ **Assistant City Attorney at** ▓▓▓▓▓▓ **from 2012-2014**    500+

▓▓▓▓▓▓▓
Miami/Fort Lauderdale Area    Government Administration        2nd
Current: Real Estate Consultant at ▓▓▓▓▓▓▓▓▓▓       ⚙
▷ **Permitting/Code Compliance at** ▓▓▓▓▓▓ **from 2003-2012**    146

▓▓▓▓▓▓▓
Miami/Fort Lauderdale Area    Government Administration        2nd
Current: CDBG Administrator at ▓▓▓▓▓▓         ⚙
▷ **CDBG Administrator at** ▓▓▓▓▓▓ **om 2010-Present**    435

▓▓▓▓▓▓▓
Miami/Fort Lauderdale Area    Civil Engineering          2nd
Current: Public Works Director at ▓▓▓▓▓▓        ⚙
▷ **Engineer at** ▓▓▓▓▓▓ **from 2007-2013**    407

▓▓▓▓▓▓▓
Miami/Fort Lauderdale Area    Law Practice           2nd
Current: Managing Attorney at ▓▓▓▓▓▓ ; Special Magistrate at ▓▓▓▓▓▓ ; Adjunct Professor ▓▓▓▓    ⚙
University ; Attorney/Owner at ▓▓▓▓    500+
▷ **Special Magistrate at** ▓▓▓▓▓▓▓▓ **from 2012-Present**

▓▓▓▓▓▓▓
West Palm Beach, Florida Area    Civil Engineering        2nd
Current: Section Administrator at ▓▓▓▓▓▓        ⚙
▷ **Section Administrator at** ▓▓▓▓▓▓ **from 2014-Present**    500+

Miami/Fort Lauderdale Area   Government Administration

**Current:** Assistant Public Works Director at ▓▓▓▓▓▓ ; Owner at ▓▓▓▓▓▓
▷ **Assistant Public Works Director at** ▓▓▓▓▓▓ **from 2010-Present**

Page 1 **2  next »**

TIP   Contact these users through an **Introduction.** You have 15 Introductions remaining.

Help Center ┊ About ┊ Press ┊ Blog ┊ Careers ┊ Advertising ┊ Talent Solutions ┊ Small Business ┊ Mobile ┊ Developers ┊ Language ┊ **Upgrade Your Account**
LinkedIn Corporation © 2014 ┊ User Agreement ┊ Privacy Policy ┊ Community Guidelines ┊ Cookie Policy ┊ Copyright Policy ┊ Send Feedback