United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| TRACEE SWEET, et. al., Plaintiffs, v. LINKEDIN CORPORATION, Defendant. | ) | Case No. 5:14-cv-04531-PSG **ORDER GRANTING MOTION TO DISMISS** **(Re: Docket No. 18)** |

Tracee Sweet wanted to work in the hospitality industry.[1] After submitting her resume to a potential employer through LinkedIn, she was invited to an interview.[2] Sweet thought things went well, especially when she later got word that she would be hired.[3] But soon thereafter, the company called her back and said it had changed its mind.[4] Sweet did not get the job.[5]

---

[1] *See* Docket No. 1 at ¶ 52.

[2] *See id.* at ¶¶ 52-55.

[3] *See id.* at ¶ 56.

[4] *See id.* at ¶ 57.

[5] *See id.*

United States District Court
For the Northern District of California

When Sweet asked why she was first told she had the job and then was told the opposite, the general manager told her what happened.[6] The company had checked some references and, based on those references, changed its mind.[7] What Sweet did not learn until later was that these references may have been the result of LinkedIn's "References Searches" function.[8] Using Reference Searches, employers can find people with whom an applicant may have worked previously.[9]

Each Plaintiff had a similar experience.[10] Believing that Reference Searches cost them jobs, they filed suit against Defendant LinkedIn Corporation, alleging that the function violated their rights under the Fair Credit Reporting Act.[11] Because Plaintiffs have not alleged sufficient facts to support a plausible FCRA claim, their claims must be dismissed.

**I.**

"The purpose of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*, is to protect consumers from the transmission of inaccurate information about them."[12] In enacting the FCRA, Congress found that "[t]here is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy."[13] To fulfill this need, the FCRA requires consumer reporting agencies to "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel,

---

[6] *See id.* at ¶ 58.

[7] *See id.*

[8] *See id.* at ¶¶ 47-49.

[9] *See id.* at ¶¶ 33-35.

[10] *See id.* at ¶¶ 49-50, 59-69.

[11] *See id.* at ¶ 3.

[12] *Kates v. Croker National Bank*, 776 F.2d 1396, 1397 (9th Cir. 1985).

[13] 15 U.S.C. § 1681(a)(4).

insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy and proper utilization of such information."[14]

Various sections of the FCRA apply only to "consumer reporting agencies" which provide "consumer reports."[15] The FCRA defines "a consumer report" as:

> [A]ny written, oral or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for. . .
>
> (B) employment purposes; or
>
> (C) any other purpose authorized under section 1681b of this title.[16]

LinkedIn "operates an online professional network called LinkedIn, through which the company's subscribers are able to create, manage and share their professional identities online."[17] LinkedIn allows anyone to become a LinkedIn member by signing up and "creat[ing] her/his own professional profile, complete with a listing of professional experience and educational background, among other things."[18] Once a person has created a profile on LinkedIn, he or she can

---

[14] 15 U.S.C. § 1681(b).

[15] *See* 15 U.S.C. § 1681b(b)(1) ("A consumer reporting agency may furnish a *consumer report* for employment purposes only if the person who obtains such report from the agency certifies . . .") (emphasis added); 15 U.S.C. § 1681e(a) (Every consumer reporting agency shall maintain reasonable procedures designed . . . to limit the furnishing of *consumer reports* . . .") (emphasis added); 15 U.S.C. § 1681e(b) ("Whenever a consumer reporting agency prepares a *consumer report*…) (emphasis added); 15 U.S.C. § 1681e(d) ("A consumer reporting agency shall provide to any person . . . to whom a *consumer report* is provided by the agency . . .") (emphasis added); 15 U.S.C. § 1681b(a)(3) ("[A]ny consumer reporting agency may furnish a *consumer report* under the following circumstances and no other . . . (3) to a person which it has reason to believe [has a permissible purpose for use of a consumer report]") (emphasis added).

[16] 15 U.S.C. § 1681a(d)(1).

[17] Docket No. 1 at ¶ 1.

[18] *Id.* at ¶ 20.

create "connections" by inviting other LinkedIn members such as "colleagues, business contacts, friends or classmates" to join the member's network.[19]

Each time a registered LinkedIn user adds information to her LinkedIn profile page, this information is added to LinkedIn's professional database.[20] "Through this process, LinkedIn assembles, aggregates, and publishes information" relating to consumers' employment histories, "co-workers, contacts, educational background, honors and awards, among other things."[21]

LinkedIn also offers "proprietary search technology" that allows LinkedIn users to search this consumer data.[22] LinkedIn's Reference Search feature is part of this search functionality.[23] The Reference Search feature allows users who pay a subscription fee to search for "references" for any LinkedIn member.[24] When a LinkedIn user runs a Reference Search on a particular LinkedIn member, the Reference Search results provide the user with two different categories of information.

First, the Reference Search results list the name of the LinkedIn member who is the subject of the search and names of his or her current and former employers:[25]

---

[19] *Id.* at ¶ 22.

[20] *See id.* at ¶ 21.

[21] *Id.* at ¶ 25.

[22] *Id.* at ¶ 31.

[23] *See id.* at ¶ 32. Plaintiffs call the results that this feature generates "Reference Reports." *See id.* at ¶ 35. Because the copy of the results of a sample Reference Search attached as an exhibit to Plaintiffs' complaint indicates that this feature is actually called a "Reference Search," the court will refer to the results this feature generates as "Reference Search results." *See id.* at Ex. A.

[24] *See id.* at ¶ 32.

[25] *See* Docket No. 1, Ex. A. The following two graphics come from LinkedIn's motion to dismiss. These graphics are excerpts of portions of the Reference Search results attached as Exhibit A to Plaintiffs' complaint with annotations LinkedIn added to clarify the subject matter of text which Plaintiffs had redacted. *See* Docket No. 18 at 3; *see also* Docket No. 18-2 at ¶ 2.

The court may take judicial notice of a "fact that is not subject to reasonable dispute" because it "is generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A court must consider documents which plaintiffs incorporate by reference in their complaints in ruling on a motion to dismiss. *See Tellabs,*



Second, the Reference Search results provide a list of LinkedIn members who are in the same network as the search initiator and who may "have worked at the same company during the same time period as the member [the search initiator] would like to learn more about."[26] The Reference Search results include for "each purported reference, the name of the employer in common between the reference and the job applicant, and the reference's position and years employed at that common employer:"[27]

---

*Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirely, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."). Under the doctrine of incorporation by reference, a court can also "consider documents in situations where the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance." *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (internal citations omitted); *see also Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007).

The authenticity of the graphics included in LinkedIn's motion to dismiss is not in question since the graphics reflect excerpts from Exhibit A to Plaintiffs' complaint and since Plaintiffs do not contest the accuracy of LinkedIn's annotations of the redacted text. *See* Docket No. 18-2 at ¶ 2. There are also no disputed issues as to these figures' relevance since Plaintiffs rely on the Reference Search results in their complaint. The court therefore considers these graphics in ruling on the motion to dismiss.

The Reference Search results also include icons next to the names of the listed references as well as a hyperlinked phrase stating "What do these icons mean?" *See* Docket No. 1 at Ex. A. Plaintiffs request that the court take judicial notice of a copy of the webpage that corresponds to this hyperlinked phrase. *See* Docket No. 19 at 1-2; *see also* Docket No. 18-2 at ¶ 3, Docket No. 18-3. Because the authority of this document is not in question and because there are no disputed issues as to its relevance since Plaintiffs rely on the sample Reference Search results in their complaint, the court takes judicial notice of the entire document, including the document to which the Reference Search results are linked, as requested.

[26] *See* Docket No. 1 at ¶¶ 33-35; *see also* Docket No. 1, Ex. A.

[27] *See id.* at ¶¶ 35-36.

United States District Court
For the Northern District of California



LinkedIn markets Reference Searches as a way for potential employers to find "Trusted References for Job Candidates," to "[g]et the real story on any candidate" and to "[f]ind references who can give real, honest feedback" about job candidates.[28] The Reference Search results encourage the search initiator to contact the listed references through an "Introduction" that LinkedIn claims allows the initiator to "contact the users in [his or her] network through the people [he or she] knows:"[29]

Current: Assistant Public Works Director at ; Owner at
Assistant Public Works Director at from 2010-Present

Page 1 2 next »

TIP Contact these users through an **Introduction.** You have 15 Introductions remaining.

LinkedIn does not tell the subjects of Reference Searches when users run searches on them.[30]

Plaintiffs are consumers who allege that LinkedIn violated their rights under the FCRA by furnishing Reference Search results for employment purposes.[31]

Plaintiff Tracee Sweet alleges she submitted her resume through LinkedIn for a job in the hospitality industry.[32] After she interviewed with the company's general manager, the potential

---

[28] *See* Docket No. 1 at ¶¶ 34, 44.

[29] *See id.* at ¶ 37. The graphic that follows is an excerpt from Exhibit A to Plaintiffs' complaint. *See id.* at Ex. A.

[30] *See id.* at ¶¶ 40, 41, 51.

[31] *See id.* at ¶ 47-50.

[32] *See id.* at 7, 52.

employer advised Sweet that she was going to be hired for the position.[33] However, soon thereafter, the company called her back and said that Sweet would not be hired.[34] When Sweet asked why the company had changed its mind, the company told Sweet that "the company had checked some references for Plaintiff Sweet and, based on those references, had changed its mind."[35]

Plaintiff James Ralston alleges that a third-party recruiter connected with him on LinkedIn and, told him that she would submit his resume to two potential employers.[36] The recruiter also advised him to apply to one of these potential employers online and told him that she expected that the potential employer would interview him.[37] Ralston did so, but was later told that the potential employer decided not to interview him.[38]

Plaintiff Lisa Jaramillo alleges that an in-house recruiter for a company contacted her about a potential job opening at the recruiter's company and Jaramillo expressed her interest in the position.[39] Another in-house recruiter for the same company connected with her on LinkedIn.[40] The company ultimately lost interest.[41]

Plaintiff Tiffany Thomas alleges that she applied for a job in the transportation industry through a LinkedIn job posting.[42] She then received a notification that a purchasing manager from

---

[33] *See id.* at ¶¶ 53-56.

[34] *See id.* at ¶ 57.

[35] *Id.* at ¶ 58.

[36] *See id.* at ¶¶ 9, 59-60.

[37] *See id.* at ¶ 61.

[38] *See id.* at ¶ 62.

[39] *See id.* at ¶¶ 8, 63-64.

[40] *See id.* at ¶ 65.

[41] *See id.* at ¶ 66.

[42] *See id.* at ¶ 10, 67.

the potential employer had viewed her LinkedIn profile.[43] She interviewed with this individual and had not received word as to whether the company will hire her by the time Plaintiffs filed their complaint.[44]

Plaintiffs assert five claims under the FCRA, alleging that LinkedIn has violated 15 U.S.C. §§ 1681b(b), 1681e(a), 1681e(b), 1681e(d) and 1681b.[45] Plaintiffs seek certification of a class under Fed. R. Civ. P. 23, statutory damages, actual damages, punitive damages, attorney's fees and costs.[46] LinkedIn now moves to dismiss Plaintiffs' complaint for failure to state a claim.[47]

**II.**

This court has jurisdiction under 28 U.S.C. § 1331. The parties further consented to the jurisdiction of the undersigned magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 72(a).

Fed. R. Civ. P. 12(b)(6) provides that the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."[48] A plaintiff must allege facts that add up to "more than a sheer possibility" that the defendant acted unlawfully.[49] While a "heightened fact pleading of specifics" is not required, the plaintiff must still allege facts sufficient to "raise a right to relief above the speculative level."[50] "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"[51] "Nor does a complaint suffice if it

---

[43] *See id.* at ¶ 68.

[44] *See id.* at ¶ 69.

[45] *See id.* at ¶¶ 77-116.

[46] *See id.* at 12-14, 20-21. Plaintiffs seek to certify a class of "[a]ll persons in the United States in the two years prior to the filing of [their complaint] who have had a Reference Search run on them that was initiated through LinkedIn's 'search for references' functionality." *See id.* at ¶ 70.

[47] *See* Docket No. 18.

[48] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[49] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[50] *Twombly*, 550 U.S. at 555, 570.

[51] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[52] In reviewing a Rule 12(b)(6) motion, a court must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff.[53] A court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."[54]

**III.**

At issue is whether Plaintiffs have alleged sufficient facts to support a plausible inference that the Reference Searches are within the FRCA's definition of a consumer report. Because Plaintiffs falls short of this requirement, the court grants LinkedIn's motion.

***First***, LinkedIn's publications of employment histories of the consumers who are the subjects of the Reference Searches are not consumer reports because the information contained in these histories came solely from LinkedIn's transactions or experiences with these same consumers. The FCPA excludes from the definition of consumer report any "report containing information solely as to transactions or experiences between the consumer and the person making the report."[55]

In particular, Plaintiffs allege that LinkedIn "operates an online professional network . . . through which [consumers] are able to create, manage and *share their professional identities online*."[56] LinkedIn then "publishes information from hundreds of millions of consumers related to their past and present employers, past and present employment duties [and] employment dates,

---

[52] *Id.* (citing *Twombly*, 550 U.S. at 557).

[53] *See al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009), *rev'd on other grounds*, 131 S. Ct. 2074 (2011).

[54] *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal citations omitted).

[55] *See* 15 U.S.C. § 1681a(d)(2)(A)(i).

[56] *See* Docket No. 1 at ¶ 1 (emphasis added).

employment skills. . . .among other things."[57] Put differently, Plaintiffs' own allegations show that consumers provide LinkedIn with information about their employment histories so that LinkedIn can publish this information online.

Plaintiffs' assertion that the "the plain language of the exclusion" and the Federal Trade Commission's "interpretations of it" do not encompass publication of self-provided employment histories is unavailing.[58] Plaintiffs cite to an FTC report finding that "[a] report by a creditor of application information supplied by a consumer…is not the creditor's 'transaction or experience' because it includes the consumer's transaction with entities *other* than the creditor."[59] This finding is based on an FTC opinion letter concerning a bank that wanted to provide information it obtained from "customer loan applications, regarding the customer's transaction with entities other than the bank" to other entities.[60] The FTC concluded that this information "could not be the [b]ank's 'transaction or experience' information because it includes only the customer's transactions with entities other than the [b]ank."[61] But this letter does not establish that LinkedIn's communication

---

[57] *See id.* at ¶ 25.

[58] *See* Docket No. 25 at 22.

[59] *See id.* at 22 (citing Federal Trade Commission, *40 Years of Experience with the Fair Credit Reporting Act, an FTC Staff Report with Summary of Interpretations*, July 2011, https://www.ftc.gov/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations, at 24 (emphasis in original)). The 40 Years Report is a compilation summary of "the Federal Trade Commission staff's interpretations of the Fair Credit Reporting Act," which includes "informal guidance staff has provided to the public in the ensuing years and [the FTC staff's] experience in enforcing the FCRA." *See* 40 Years Report at 17. The report "does not have the force or effect of regulations or statutory provisions," but it does provide persuasive guidance from the agency charged with enforcing and interpreting the FCRA before transfer of that authority to the Consumer Financial Protection Bureau in July 2011. *See id.*; *see also* 76 Fed. Reg. 44462-01 (July 26, 2011); *Klonsky v. RLI Ins. Co.*, Case No. 2:11-cv-250, 2012 WL 1144031, at *2 (D. Vt. Apr. 4, 2012) ("While the FTC's interpretation of the FRCA does not have the force of law, it should be viewed in light of the fact that the Supreme Court has long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer.") (internal citations omitted).

[60] *See* Novak, *FTC Informal Staff Opinion Letter*, Sept. 9, 1998, https://www.ftc.gov/policy/advisory-opinions/advisory-opinion-novak-09-09-98; *see also* 40 Years Report at 24 n.32.

[61] *See id.*

of subjects' employment histories is outside of the transactions or experiences exception. Nowhere in the letter is there any indication that the banks' customers provided the information in their bank loan applications so that the bank could give this information to other entities. In contrast, sharing information is precisely why the subjects here or anyone else on LinkedIn provides their employment histories to LinkedIn.[62]

Likewise, Plaintiffs' reliance on *Salazar v. Golden State Warriors* for the principle that "a rebroadcasting of the consumer's transactions and experiences with a third-party" is not within the transactions and experience exception is misplaced.[63] In *Salazar*, the court held that a report from a private investigator stating that an employee used drugs reflected that entity's "transactions or experiences" with the employee.[64] In making this finding, the court cited to another FTC opinion letter in which the FTC found that the transactions or experiences exception applied to a communication which a consumer's prior employer provided to a credit reporting agency.[65] However, the FTC determined that the exception did not apply to "communications from the [credit reporting agency] to [the consumer's] potential employer 'because the experiences referred to in the communication are not between the job applicant and the [credit reporting agency]' and thus are second-hand."[66] In other words, in the letter cited in *Salazar*, the FTC concluded that a communication of information obtained from a "second-hand" source is outside the exception, not that any communication which describes a consumer's experience with a third party is outside the exception.

Equally misplaced is Plaintiffs' claim that the Reference Searches' inclusion of information about the listed references takes LinkedIn's publication of subjects' employment histories outside

---

[62] *See* Docket No. 1 at ¶¶ 1, 19-25.

[63] *See* Docket No. 25 at 22-23 (citing 124 F. Supp. 2d 1155, 1160 (N.D. Cal. 2000)).

[64] *See Salazar*, 124 F. Supp. at 1157, 1161.

[65] *See id.* at 1160.

[66] *See id.* (internal citations omitted).

**United States District Court**
For the Northern District of California

the exception.[67] In *Salazar*, the court held a "listing of the registered owners of automobiles encountered by investigator" was "second-hand information" but did not "remove the report [in which this listing was included] from the exception because the list did not include information pertaining to the plaintiff."[68] As Plaintiffs note, the information about the listed references included in the Reference Search results is "second-hand information" because this information does not derive from the subject of the search.[69] However, like the listing in *Salazar*, this information is about the listed references, not the subjects of the searches, and thus does not "include information pertaining to the [Plaintiffs]."[70]

***Second***, even if the LinkedIn's publications of the employment histories of the consumer-subjects of the Reference Searches were not within the transaction or experience exception, they still would not be consumer reports because Plaintiffs' allegations do not raise a plausible inference that LinkedIn acts as a consumer reporting agency when it publishes these histories. To meet the definition of a consumer report, a communication must be made "by a consumer report agency."[71] A "consumer reporting agency" is defined as "any person which, for monetary fees…regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports."[72] However, "[a]n entity does not become a [consumer reporting agency] solely because it conveys, with the consumer's consent, information about the

---

[67] *See* Docket No. 25 at 23-24.

[68] *See* 124 F. Supp. 2d at 1160.

[69] *See* Docket No. 25 at 23-24.

[70] *See id.*

[71] *See* 15 U.S.C. § 1681a(d)(1) ("The term 'consumer report' means any…communication of any information by a *consumer reporting agency*.") (emphasis added).

[72] *See* 15 U.S.C. § 1681a(f).

consumer to a third party in order to provide a specific product or service that the consumer has requested."[73]

Plaintiffs are correct that they "need not at this stage prove that [LinkedIn] is in fact a 'consumer reporting agency.'"[74] However, Plaintiffs are incorrect that their allegations are "similar" to allegations found sufficient in *Robins v. Spokeo, Inc.*[75] In *Robins*, the court held that the plaintiff's allegations that the defendant "regularly accepts money in exchange for reports that contain data and evaluations regarding consumers' economic wealth and creditworthiness [were] sufficient to support a plausible inference that [d]efendant's conduct falls within the scope of the FCRA."[76] In contrast to *Robins*, where there was no indication that the plaintiff voluntarily provided the information contained in the challenged reports to the defendant, here Plaintiffs specifically allege that the consumers who are the subjects of the Reference Searches voluntarily provide their names and employment histories to LinkedIn for the purpose of publication.[77] As LinkedIn notes, the facts alleged in Plaintiffs' complaint therefore support the inference that LinkedIn gathers the information about the employment histories of the subjects of the Reference Searches not to make consumer reports but to "carry out consumers' information-sharing objectives."[78] As a result, Plaintiffs' conclusory allegation that LinkedIn "for monetary fees, engages in the practice of assembling information on consumers, for the purposes of furnishing

---

[73] *See* 40 Years Report at 30-31.

[74] *See* Docket No. 25 at 10 (citing *Robins v. Spokeo, Inc.*, Case No. CV10-05306-ODW(AGRx), 2011 WL 1793334 at *2 (C.D. Cal. May 11, 2011)).

[75] *See* Docket No. 25 at 10.

[76] *See Robins*, 2011 WL 1793334 at *2.

[77] *See* Docket No. 1 at ¶¶ 1, 19-25; *see also* Docket No. 25 at 8 (acknowledging that "consumers may voluntarily provide the names of current and former employers to LinkedIn").

[78] *See* Docket No. 18 at 11.

consumer reports to third parties" does not support a plausible inference that LinkedIn acts as a consumer reporting agency with regard to its assembly of this information.[79]

***Third***, Plaintiffs' allegations are insufficient to state a claim that the list of names and other information about the references included in the Reference Search bears on the "character, general reputation, mode of living" and other relevant characteristics of the consumers who are the subjects of these searches.[80] Plaintiffs contend that whether a subject's listed references have jobs in a certain industry or live in a certain geographic location bears on the subject's relevant characteristics by showing whether he or she is well-connected in that industry or associates with people from that location.[81] Plaintiffs also argue that the inclusion of a reference who is notorious or well-respected in the industry in which the subject is seeking employment, such as "Bernard Madoff for someone applying for a job in finance" or "a federal judge for someone seeking employment in the legal industry," also bears on a subject's relevant characteristics.[82]

The problem here is that Plaintiffs do not allege that Reference Search results indicate that subjects actually knew or associated with the listed references. Instead, Plaintiffs allege that the Reference Search results list people who once had a common employer with the subject of the search and are in the network of the person who initiated the search.[83] Because the people listed

---

[79] *See* Docket No. 25 at 7 (citing Docket No. 1 at ¶¶ 2, 20-25, 32-39, 43-46, 79). As stated above, Plaintiffs correctly note that the Reference Search results contain information about the listed references which the consumer who is subject of the report did not provide to LinkedIn. *See* Docket No. 25 at 8-10. However, Plaintiffs' claim that LinkedIn does not carry out "consumers' information-sharing objectives" because most of the consumer information which LinkedIn aggregates and disseminates is derived from "data obtained from third-parties" is unavailing. *See id.* at 9. Plaintiffs ignore the distinction LinkedIn makes between its communication of the search subject's self-provided employment history and its communication of information about people with whom the subject may have worked. *See* Docket No. 30 at 1. Contrary to Plaintiffs' assertion, LinkedIn does not claim that it does not act as a consumer report agency with regard to its communication of information about people who may have worked with subject, only that it does not act as a consumer reporting agency with regard to its communication of the subject's self-provided employment history. *See id.*

[80] *See* Docket No. 1 at ¶¶ 78, 85, 94, 102, 110.

[81] *See* Docket No. 25 at 12-13.

[82] *See id.* at 13.

[83] *See* Docket No. 1 at ¶¶ 33-35, *see also* Docket No. 1, Ex. A.

are allegedly in the searcher's network, not the subject's network, in the situations Plaintiffs describe, the Reference Search results would communicate whether the searcher, not the subject of the search, is well-connected in a certain industry or is associated with a notorious person.

Further, Plaintiffs fail to cite to any authority that actually holds that a communication which provides information about people other than the consumer who is allegedly the subject of the report bears on that consumer's relevant characteristics. For instance, Plaintiffs cite to *Trans Union Corp. v. FTC* for the proposition that "almost any information about consumers arguably bears on their personal characteristics or mode of living."[84] But in contrast to the list of references at issue here, the court in *Trans Union* held that information in the challenged reports about the consumers who were the supposed subjects of those reports—such as whether they had established multiple credit accounts—bore on those consumers' modes of living.[85] Plaintiffs' reliance on a FTC letter that found that a person's employment history "unquestionably bears on his or her character, reputation, and other listed characteristics" is similarly misplaced.[86] Like the court in *Trans Union*, the FTC concluded that information about job applicants' *own* employment histories—not information about the employment histories of other people—"unquestionably" bore on these applicants' relevant characteristics.[87]

Nor can Plaintiffs rely on cases in which courts held that a broad variety of information can bear on a person's mode of living. These cases again simply do not hold that information about people other than the consumer who is the subject of a challenged report can bear on that consumer's mode of living. In particular, Plaintiffs contend that Reference Search results that indicate that a consumer's references live in a certain location would bear on that consumer's

---

[84] *See* Docket No. 25 at 10-11 (citing *Trans Union Corp. v. Federal Trade Comm'n*, 245 F.3d 809, 813 (D.C. Cir. 2001) (quoting *Trans Union Corp. v. Federal Trade Comm'n*, 81 F.3d 228, 231 (D.C. Cir. 1996)).

[85] *See Trans Union*, 81 F.3d at 231.

[86] *See* Docket No. 25 at 11 (citing Leathers, *FTC Informal Staff Opinion Letter*, Sept. 9, 1998, http://www.ftc.gov/policy/advisory-opinions/advisory-opinion-leathers-09-09-98).

[87] *See id.*

personal characteristics because the court in *Moreland v. CoreLogic SafeRent LLC* held that "[w]here people live and how long they live there can say a lot about their 'mode of living'—how rich or poor they are, how big or small their family is, how closely or loosely they're tied to a community, what sports teams or political parties they support, how often they change jobs, and what kinds of cars or pets they have, to offer just a few examples."[88] Plaintiffs also claim that, similar to cases in which courts have found that information about a consumer's former employers and whether he or she has a valid driver's license can bear on that consumer's mode of living, here the Reference Searches allegedly contain "specific, concrete information" that bears on a consumer's relevant characteristics.[89] However, in all of these cases to which Plaintiffs cite, the courts held that the challenged communications might bear on consumers' modes of living because they contained information about the consumers who were the subjects of those communications.[90]

The allegations in Plaintiffs' complaint contradict their claim that LinkedIn markets the Reference Search results as "a means to obtain additional 'bearing on' information" about the subjects of these searches.[91] Plaintiffs' allegation that LinkedIn markets these results as a way for

---

[88] *See* Docket No. 25 at 12-13 (citing Case No. SACV 13-470-AG(ANx), 2013 WL 5811357, at *4 (C.D. Cal. Oct. 25, 2013).

[89] *See* Docket No. 25 at 16; *see also Phillips v. Grendahl*, 312 F.3d 357, 366 (8th Cir. 2002) ("The Finder's Report also lists [the subject of the report's] former employers, which also would bear on his mode of living by showing that he has been employed. We conclude that the Finder's Report contains the kind of personal information required by the definition of consumer report."); *Ernst v. Dish Network, LLC*, Case No. 12-cv-8794(LGS), 2014 WL 4693700, at *5 (S.D.N.Y. Sept. 22, 2014) (finding that "whether or not an individual has a valid driver's license might not bear on his character, but it might describe his 'mode of living,' which is broad and undefined.").

[90] *Moreland*, 2013 WL 5811357, at *1, 4 (rejecting defendant's assertion that report containing information about a prospective tenant's former addresses did not meet the FCRA's "bearing on" element because "[w]here a person lives is a fundamental 'personal characteristic'"); *Phillips*, 312 F.3d at 365-65 (report listing "the names of several creditors with whom [the subject of the report] had credit accounts and the existence of a child support obligations, with dates for 'last activity'" and subject's "former employers" bore on subject's mode of living); *Ernst*, 2014 WL 4693700, at *4-5 (S.D.N.Y. Sept. 22, 2014) (report labeling consumer as "high risk" communicated "bearing on" information under the FCRA).

[91] *See* Docket No. 25 at 16.

**United States District Court**
For the Northern District of California

potential employers to "[g]et the real story on any candidate," might, standing alone, support Plaintiffs' contention that LinkedIn markets the Reference Search results themselves as a way to obtain bearing on information about the subjects of these searches.[92] However, Plaintiffs also allege that LinkedIn markets the reference search functionality as a way for a potential employer to "*locate[] people* in [his or her] network who can provide reliable feedback about a job candidate" and to "[f]ind references who can give real, honest feedback" about job candidates.[93] Taken together, these allegations support the inference that LinkedIn markets the Reference Search results a way to "locate[] people" who might be able to communicate bearing on information about the consumer-subjects of these results, not that these results themselves convey bearing on information.[94]

***Fourth***, Plaintiffs do not state a claim that the Reference Search results are used or intended to be used as a factor in determining whether the subjects of the searches are eligible for employment. A communication must be "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for . . . employment purposes . . . ." in order to be a consumer report.[95] To determine whether a communication meets this purpose element, courts consider the "purpose for which the information [contained in the communication] was originally collected in whole or part by the consumer reporting agency" as well as the "ultimate use" to which that information is put.[96]

Plaintiffs' contention that *Pappas v. City of Calumet City* supports its claim that Plaintiffs have adequately alleged that the Reference Searches fall within the purpose element of the consumer report definition is unavailing.[97] In *Pappas*, the defendant obtained a credit report on the

---

[92] *See* Docket No. 1 at ¶ 44.

[93] *See id.* at ¶¶ 33, 44 (emphasis added).

[94] *See id.* at ¶ 33.

[95] *See* 15 U.S.C. § 1681a(d)(1)(B).

[96] *See Bakker v. McKinnon*, 152 F.3d 1007, 1012 (8th Cir. 1998) (internal citations omitted).

[97] *See* Docket No. 25 at 18 (citing 9 F. Supp. 2d 943, 949 (N.D. Ill. 1998)).

**United States District Court**
For the Northern District of California

plaintiff by telling the credit reporting agency that provided the report that the defendant would use the report for "employment purposes" but actually used the credit report to investigate the plaintiff's company.[98] The court concluded the credit report was a consumer report because as long as the credit reporting agency "expected" the defendant to use the credit report "for employment purposes," the defendant's "actual reason for obtaining [the credit report] is irrelevant."[99]

In contrast to the defendant in *Pappas*, here, as stated above, LinkedIn markets the Reference Search results—and therefore expects them to be used—as a way for potential employers to locate people who can provide reliable feedback about job candidates and does not market the results themselves as a source of reliable feedback about job candidates.[100] Further, Plaintiffs allege that one of the named plaintiffs applied to a job through LinkedIn and was not hired for this job after the potential employer told her that it had "checked some references" on her even though the named plaintiff had not provided any references to the potential employer.[101] This allegation might support an inference that the potential employer decided not to hire the named plaintiff based on information provided by references whom the potential employer located by running a Reference Search on the named plaintiff, but does not indicate that the potential employer used the Reference Search themselves to determine the named plaintiff's eligibility for employment. Thus, Plaintiffs' allegations do not support a reasonable inference that LinkedIn expected the Reference Search results to be used or that potential employers actually used these results to determine consumers' eligibility for employment.

Plaintiffs' claim that their allegations support a reasonable inference that the Reference Search results "can contribute to hiring decisions made by employers" is insufficient to show that

---

[98] *See Pappas*, 9 F. Supp. 2d at 947.

[99] *See id.* at 948.

[100] *See* Docket No. 1 at ¶¶ 33, 44.

[101] *See id.* at ¶¶ 52-58.

United States District Court
For the Northern District of California

the results are used or intended to be used for employment purposes.[102] Plaintiffs need not establish that the "information communicated by the [Reference Search results], standing alone, could be used" to make an employment-related decision in order to establish that the Reference Search results are consumer reports.[103] However, the consumer report definition does not encompass every tool or reference that employers might use to access job candidates. As LinkedIn notes, the fact that a potential employer could use a telephone directory for a job candidate's current employer to contact people who know the candidate does not make that directory a consumer report.[104] Similarly, Plaintiffs' claim that LinkedIn "provides the people and businesses accessing the [Reference Search results] with tools to communicate directly with the 'references' listed therein" is not sufficient to establish that the results themselves are used or intended to be used to determine consumers' eligibility for employment.[105]

Likewise, Plaintiffs' position that their allegation that the Reference Search results are used, expected to be used and marketed by LinkedIn to be used "for employment purposes" is sufficient "at this stage of the litigation" lacks merit.[106] Plaintiffs contend that a communication is a "consumer report" if it is "used or expected to be used or collected *either* to (1) 'serve as a factor in establishing the consumer's eligibility' for credit, insurance, employment; *or* (2) for "other purposes authorized under section 1681b…."[107] Section 1681b(a)(3) of the FCRA provides that one of the situations in which it is permissible for a consumer reporting agency to furnish a consumer report is when the recipient of the report is "a person which [the consumer reporting

---

[102] *See* Docket No. 25 at 19.

[103] *See In re Trans Union Corp.*, No. 9255, 2000 WL 257766, at *12 n.18 (F.T.C. Feb. 10, 2000) (citing *Trans Union*, 81 F.3d at 233).

[104] *See* Docket No. 30 at 12.

[105] *See* Docket No. 25 at 19.

[106] *See id.* at 21.

[107] *See id.* at 19 (quoting *Yang v. Gov't Employees Ins. Co.*, 146 F.3d 1320, 1323 (11th Cir. 1998) (citing 15 U.S.C. § 1681a(d)(1))).

United States District Court
For the Northern District of California

agency] has reason to believe…intends to use the information for employment purposes." As Plaintiffs note, courts have found that because Section 1681b(3) "restrict[s] the uses to which a consumer report may be put," for this section to be "meaningful, 'consumer report' must be interpreted to mean any report made by a credit reporting agency of information that could be used for one of the purposes enumerated in § 1681a."[108]

But even if Plaintiffs are correct that the consumer report definition encompasses communications that could be used for the purposes enumerated in Section 1681b(a), as LinkedIn notes, this definition would not extend to all communications "with any attenuated connection to 'employment.'"[109] Further, Plaintiffs' reliance on cases in which courts held that communications could be consumer reports if they fell within one of the purposes authorized under Section 1681b is misplaced.[110] In the cases to which Plaintiffs cite, the consumer reporting agencies expected the communications at issue to be used for purposes authorized under Section 1681b.[111] In contrast, as

---

[108] *See* Docket No. 25 at 20-21 (quoting *Belshaw v. Credit Bureau of Prescott*, 392 F. Supp. 1356, 1359-60 (D. Ariz. 1975); *see also Yang*, 146 F.3d at 1323-24 ("To complete section 1681a(d)'s definition of a consumer report, we must …refer to section 1681b, entitled "'Permissible purposes of consumer reports'… [S]ection 1681b …adds to section 1681a(d)'s definition of a consumer report, as well as delineates the permissible uses for those 'communications of information' already falling within the definition of a 'consumer report.'") *but see Mende v. Dun & Bradstreet, Inc.*, 670 F.2d 129, 133 (9th Cir. 1982) ("The *Belshaw* definition depends on whether information could be used for certain purposes, not on whether it is collected for certain purposes. This expansive interpretation of consumer report has been criticized as bringing 'within the coverage of the Act any gathering of information about an individual, even if the context were such clearly non-consumer activities as engagement in profit-making transactions…or litigation against a defendant whose insurer requests a report…'") (quoting *Henry v. Forbes*, 433 F. Supp. 5, 9 n.5 (D. Minn. 1976)).

[109] *See* Docket No. 30 at 12.

[110] *See* Docket No. 25 at 21.

[111] *See Beresh v. Retail Credit Co.*, 358 F. Supp. 260, 261-62 (C.D. Cal. 1973) (holding that "insurance claims investigative reports" which were made "for the purpose of determining whether [plaintiff] was totally disabled as a result of water skiing accident" were within the definition of "consumer reports"); *Greenway v. Information Dynamics, Ltd.*, 399 F. Supp. 1092, 1095 (D. Ariz. 1974) (holding that communications made in order to "furnish subscribing merchants with information on consumers who may tender checks in payment for purchases so that the subscriber may decide whether or not to accept the check" were within the definition of "consumer reports" in part because the "expectation is that the information will be used by [subscribers] in connection

United States District Court
For the Northern District of California

stated above, here Plaintiffs allege that LinkedIn expects the Reference Search results to be used to contact people who may have information about the subjects of these searches that can be used for employment purposes.

**IV.**

LinkedIn's motion to dismiss is GRANTED. The Ninth Circuit requires that further leave to amend be given unless it is clear that the complaint's defects cannot be cured.[112] Because the court is not yet persuaded that Plaintiffs' defects are beyond cure, leave to amend is granted. Plaintiffs shall file any further amended complaint no later than May 19, 2015.

**SO ORDERED.**

Dated: April 14, 2015

PAUL S. GREWAL
United States Magistrate Judge

with a business transaction—a purchase of goods or services—between the subscriber and the consumer").

[112] *See Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).